In the Interest of T.D.E., Minor Child,

T.M.E., Mother, Appellant.

No. 11–0031.

Court of Appeals of Iowa.

Feb. 23, 2011.

Sarah L. Smith of Bennett, Crimmins & Smith Law Firm, Fort Dodge, for appellant mother.

Kurt T. Pittner, Fort Dodge, for appellee father.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Ricki Osborn, County Attorney, and Laura Barnaby, Assistant County Attorney, for State.

Marcy Lundberg of Marcy Lundberg Law Office, Fort Dodge, attorney and guardian ad litem for minor child.

POTTERFIELD, J.

This appeal requires us to determine the physical and legal custody status of the child, T.E., before the filing of the child in need of assistance petition, since the custody status governs the "goals of a child's placement and the next step in juvenile proceedings." *In re B.L.*, 470 N.W.2d 343,

345 (Iowa 1991). The mother believes she had sole legal and physical custody prior to the child in need of assistance action and thus custody must be returned to her absent specific findings that transfer of custody was warranted. We conclude however that because the father acknowledged the child within a short time after his birth, the court properly placed the child with the father after the dispositional hearing pursuant to Iowa Code section 232.101 (2009) (order "permitting a child's parent ... at the time of the filing of the petition to retain custody"). Consequently, the permanency order entered pursuant to 232.104(2)(a) (returning child to child's home) was not in error. We therefore affirm.

## I. Legal Principles.

Iowa Code section 232.101 allows the juvenile court to enter a dispositional order "permitting the child's parent, guardian or custodian at the time of the filing of the [CINA] petition to *retain* custody of the child subject to terms and conditions." (Emphasis added.)

Iowa Code section 232.102 allows the juvenile court to enter a dispositional order "*transferring* the legal custody of the child to ... [a] parent who does not have physical care of the child, other relative, or other suitable person." (Emphasis added).

The mother of T.E. contends that the court was required to use section 232.102, since she enjoyed sole legal and physical custody of the child since birth under Iowa Code section 600B.40, which provides: "The mother of a child born out of wedlock whose paternity has not been acknowledged ... has sole custody of the child unless the court orders otherwise."

Our supreme court construed section 600B.40 (previously codified at section 675.40) "as placing sole custody of a child born out of wedlock with the mother unless the father steps forward and acknowledges paternity of the child within a reasonable time." *B.L.*, 470 N.W.2d at 346. Where a father has acknowledged paternity within a reasonable time, the mother does not have sole custody; the unwed parents share legal custody. *See In re J.R.H.*, 358 N.W.2d 311, 319 (Iowa 1984); *In re L.B.*, 530 N.W.2d 465, 468 (Iowa Ct.App.1995).

## II. Background Facts and Proceedings.

T.E. was born in October 2006. T.E.'s mother is Trista; his father is Justin. The parents have never been married to each other. At the time of T.E.'s birth, Justin was living in George, Iowa. He learned of T.E.'s birth in early December, and made arrangements to visit T.E. at Christmas at Trista's home in Fort Dodge. Justin then moved to Fort Dodge to be near T.E. Justin provided some financial support; visited T.E. midweek frequently; and, beginning when T.E. was about ten months old, had regular overnight visits on weekends. Justin signed a paternity affidavit and his name appears on T.E.'s birth certificate. He began paying regular child support after a Child Support Recovery Unit action in 2008.

In 2008, when T.E. was about two years old, Trista was charged with child endangerment and OWI for driving while under the influence of marijuana with her brother, a minor, in the car.[1] At that time the Department of Human Services (DHS) provided services to Trista and closed its abuse report.

---

1. Her brother was also smoking marijuana. This incident also resulted in a founded child

case without juvenile court involvement a few months later.

In August 2009, the DHS again became involved with Trista following allegations Trista was using marijuana and methamphetamine on a daily basis in the presence of T.E. and other minors in her household.[2] T.E. was with Justin on a weekend visit at the time and the parents agreed that T.E. should stay with Justin until results from Trista's drug screens were obtained. Trista tested positive for marijuana and methamphetamine; the methamphetamine levels were very high. T.E. also tested positive for methamphetamine at a very high level.[3] The DHS provided crisis intervention services and provided Trista with supervised visits with T.E.

On September 29, 2009, a petition was filed alleging T.E. was a CINA pursuant to Iowa Code sections 232.2(6)(c)(2) (child has suffered harmful effects as result of failure of parent to exercise reasonable degree of care in supervising child) and 232.2(6)(n) (parent's mental capacity or condition, or drug or alcohol abuse results in the child not receiving adequate care). T.E. had been in the physical care of Justin for about a month before the petition was filed and continued to live with Justin during the juvenile court proceedings.

On December 8, 2009, the juvenile court adjudicated T.E. a CINA and ordered "temporary custody of the child would be placed with the father under the protective supervision of DHS" until the dispositional hearing, which all parties agreed should be scheduled for a later date. The court noted Trista "was waiting to be arrested," had a "serious history of substance abuse," was "currently on probation for a felony-level

drug charge," and "has several serious charges filed against her at this time." The court also observed T.E. was exposed to methamphetamine because of Trista's actions and it was "clear that the mother will need to make drastic changes before reunification with her can occur and that therefore concurrent planning should be conducted."

That same day, the juvenile court entered a "Notice to the District Court" that it "has now transferred physical custody of the above named child from the mother [Trista] to the father [Justin]" and requested a suspension of Justin's child support obligation "[b]ased on this change of custody."

Trista was arrested after the December 8, 2009 court hearing and later ordered to reside in a halfway house. Once there, Trista completed a substance abuse evaluation, engaged in job searches, attended an employment class, and began to attend outpatient treatment and provide clean drug screens. She had supervised visits with T.E. in January 2010, which went well.

In a report to the court filed February 2, 2010, DHS Social Worker Laurie Tague outlined Trista's efforts, the updated contract of expectations developed at a January 19 family team meeting, and the DHS's concern about Trista having a male visitor who brought drug paraphernalia. On February 2, 2010, a dispositional hearing was held at which all parties agreed T.E. continued to be a CINA and "it would be in the best interest of the child to remain in the custody of his father under the protective supervision of DHS." In the dispositional order entered that same date,

---

**2.** Trista was then living with her brother, still a minor, her sister, and her sister's four-year-old child.

**3.** Trista's nephew, whom she often supervised, also tested positive for methamphetamine. Two more founded abuse reports resulted.

the court adopted the recommendations in the DHS report to the court. The court denied Justin's request that the juvenile court grant concurrent jurisdiction to the district court as premature, stating:

> The Court believes that juvenile court is in a better position than district court at this time to decide the custody issue for the child. The Court notes that the placement with the father has been going very well. The mother is still in a halfway house placement because of her criminal charges. She is somewhat stalled in that program until she can obtain employment. By this summer the child will have been in the father's care for about a year. The mother will need to successfully complete the halfway house program and then establish herself in an appropriate residence, maintain employment, and fulfill the Contract of Expectations before the Court will consider returning custody to her. If at the next hearing the father has continued to do well as a caretaker of the child and the mother is not yet ready to resume custody, the Court will likely authorize concurrent jurisdiction.

A combination permanency/review/modification hearing was scheduled for July 20, 2010. In a July 2010 report to the court, Ms. Tague indicated Trista had left the halfway house, moved into an apartment, and secured employment. However, Trista had twice achieved unsupervised visits and then had them suspended because on two occasions she allowed a different man not authorized by DHS to be present at the visits. Ms. Tague observed T.E. had made dramatic developmental improvements[4] and was thriving in his father's home. Noting Trista was not able to provide a safe and stable environment and did not understand the impact on T.E. of her life choices, Ms. Tague stated it was the DHS's recommendation that permanency be with Justin "where [T.E.] has been living since DHS became involved on August 27, 2009."

On July 20, 2010, being "advised that this would be a contested matter and that insufficient time had been allotted for the hearing," the court cancelled the permanency hearing and rescheduled it for October.

In an October 2010 report to court, Ms. Tague enumerated the areas in which Trista had showed progress since July and stated:

> The only concern is that Trista has a friend who she states is just a friend. So far this man has not been around [T.E.] and Trista assures this worker that he will not get in the way of her reunifying with her son. However, this man just got out of prison and has a criminal history. The concern is if Trista were to allow this man to be in her life, he would be in [T.E.]'s life.

Ms. Tague stated it was DHS's current recommendation that Trista be allowed a trial home placement as she had fulfilled the contract of expectations.

At the permanency hearing on October 15, Ms. Tague stated in the past ninety days Trista had met all the terms of the contract of expectations:

> The only concerns that I have are going to be the concerns that everyone else has and that is that she would veer away from the rules that have been set up and that she would allow someone who's inappropriate to be around [T.E.]. I have no reason to believe that she will do that, other than her past history.

---

4. T.E. was developmentally delayed when he first began to live with Justin. Justin and his live-in girlfriend, Teresa, ensured T.E. received assistance and special services to overcome his deficits.

When asked by Trista's attorney, if Trista had ended the relationship with this man after the discussion of his criminal history, Ms. Tague stated, "To my knowledge."

Ms. Tague explained that Trista's apartment was clean and appropriate for T.E. Michelle Boyd of Children & Families of Iowa stated, "[Trista] seems to protect [T.E.] and he never leaves the apartment without her.... So I don't have any concerns that he would ever be harmed in that apartment."

Ms. Boyd acknowledged that on July 14, 2010, she had written a letter in which she expressed concerns about Trista allowing unauthorized people at her visits who are not safe for her son to be around, even with numerous attempts to inform Trista of the impact this could have on her visitation; Trista's feeling that she did not need to follow the rules set out for her visits; and Trista's continuous lying. Ms. Boyd stated Trista had made a "miraculous turn-around" in the past ninety days.

Trista stated she is currently on probation for child endangerment related to T.E.'s methamphetamine exposure.[5] She stated she had had a drug problem since she was sixteen (about ten years) and that her drug of choice was marijuana. Trista stated she had not used marijuana or methamphetamine since November 24, 2009, and she no longer associated with any individuals from her past that continued to use drugs. She attends AA or NA once or twice a week. She is employed, resides in a two-bedroom apartment where T.E. has his own room, and was working on getting her driver's license.[6] Of the man about whom DHS expressed concern, Trista stated she was not romantically involved with him, they just "h[u]ng out,"

and when she learned of his criminal history "she quit talking to him, quit hanging out with him." Trista stated Justin "does an excellent job" as a parent.

The hearing could not be completed in the time allowed and was adjourned until December 9, 2010.

A December 2010 report to the court by Ms. Tague indicated that since October 15, T.E. continued to live with his father and "has thrived"; Trista was still employed and living at the same address; Trista had been allowed multiple visits per week with T.E.; and "she ha[d] demonstrated to be consistent and stable for an additional two months since the previous hearing."

Ms. Tague also reported Trista had just recently informed her she was five months pregnant and the father of the baby was the man about whom the DHS had expressed concerns, Brent. Trista had not informed Brent of her pregnancy. The report continues:

> It is not the Department's position that Trista can provide a better home for [T.E.], it is simply the position of the department that Trista has met her expectations. However, the relationship between Trista and [T.E.] is obvious. They are bonded and [T.E.] is so happy when he is with Trista and sad when he has to leave. Trista's motivation to maintain her sobriety is exemplified [sic] with her continued aftercare support, AA meetings, NA meetings and parent partner. Trista has worked hard to change her life, she has an opportunity to show the courts that she is willing to provide a safe and stable home for her son. This is what was asked of her and this is what she has accomplished.

---

5. Trista stated probation was to end in August or September 2011.

6. Trista has never had a driver's license and her eligibility to obtain a license was revoked by virtue of a 2002 felony drug charge.

On December 10, 2010, the permanency hearing continued. Ms. Tague was asked additional questions about her concerns and recommendation. She informed the court that she had not performed an extensive background check of Brent, the father of Trista's unborn child. She stated she performed a cursory background check in August 2010 after Trista asked if the DHS would approve of his being around T.E. At that point she learned he had a fairly extensive criminal history (some being drug related) and had been charged with attempted murder, but pled to a lesser charge, which she thought was "assault with intent." Ms. Tague stated Brent had gone to prison "for quite a while. He just got out of prison I believe this past summer." Ms. Tague stated Trista was informed in August that "[T.E.] is never allowed to be around him."

Trista stated she knew Brent had a criminal history with drugs when she met him, which was about the time she was getting out of the halfway house. She stated she was unaware of his history with violent crimes until informed by service providers in August. She stated she had concerns about him, but "I would feel obligated to let him know that I was pregnant and I would file for child support."

Justin and Teresa both explained that T.E. had made good progress developmentally since coming to live with them full-time. Both had been informed by service providers that routine and consistency were very important to T.E. and they expressed concern about the effects of changing custody after some stability had been achieved.

On December 21, 2010, the juvenile court entered the permanency order. The court found that at the time the CINA petition was filed Justin had acknowledged paternity and thus both the mother and the father shared the right to legal custody, with Justin being the physical custodian as of August 2009. The court noted the first court order establishing custody as between the parents was the dispositional order, which retained custody of the child with the father only pursuant to Iowa Code section 232.101[7] rather than section 232.102.[8] As a result the father held legal and physical custody of T.E. in the CINA proceedings. Pursuant to section 232.104(2)(a), the court then ordered T.E. returned to the legal custody of the parents under the protective supervision of the DHS for continued placement in the physical custody of Justin. The court also authorized concurrent jurisdiction to allow the parties to litigate the issues of custody, visitation, and support in the district court.

Trista now appeals. The State's position at the time of the permanency hearing was that, having fulfilled her contract of

---

7. Iowa Code section 232.101, entitled "Retention of custody by parent," provides:

    1. After the dispositional hearing, the court may enter an order permitting the child's *parent, guardian or custodian at the time of the filing of the petition* to retain custody of the child subject to terms and conditions which the court prescribes to assure the proper care and protection of the child. . . .
    2. The duration of any period of supervision or other terms or conditions shall be for an initial period of no more than twelve months and the court, at the expiration of

that period, upon a hearing and for good cause shown, may make not more than two successive extensions of such supervision or other terms or conditions of up to twelve months each.

8. Section 232.102(1)(a)(1) provides:

    After a dispositional hearing the court may enter an order transferring the legal custody of the child to one of the following for purposes of placement: ... [a] parent who does not have physical care of the child, other relative, or other suitable person.

expectations, the juvenile court should delay permanency to give Trista more time. The court rejected this position, but the State did not appeal and does not participate in Trista's appeal.

### III. Scope and Standard of Review.

██ Our review of permanency orders is de novo. *In re A.A.G.*, 708 N.W.2d 85, 90 (Iowa Ct.App.2005). We review both the facts and the law and adjudicate rights anew on the issues properly presented. *Id.* We give weight to the juvenile court's findings, but are not bound by them. *Id.*

### IV. Discussion.

██ "The mother of a child born out of wedlock *whose paternity has not been acknowledged* and who has not been adopted has sole custody of the child unless the court orders otherwise." Iowa Code § 600B.40 (2009) (emphasis added). On appeal, Trista argues the evidence presented does not support the juvenile court's finding that Justin acknowledged paternity within a reasonable time.[9]

Our de novo review of the record, however, convinces us Justin did acknowledge paternity within a short time after T.E.'s birth in 2006. Justin's acknowledgement of his paternity of T.E. differs significantly from the father/child relationship described in *B.L.*:

> The mother had very limited involvement with the father who was not even aware of B.L.'s birth until B.L. was about one-year old. Thereafter, the father had very little contact with the boy. The father did not pay support until

B.L. was over six years of age, and he was forced to do so following a paternity action. The father never requested nor received any custodial or visitation rights, except for the rights received in this juvenile proceeding.

*B.L.*, 470 N.W.2d at 344.

Here, Justin moved to Trista's home town to be part of T.E.'s life. Long before the CINA proceedings, Justin regularly visited T.E. and had overnight visitations almost every weekend beginning when T.E. was about ten months old. T.E. was with Justin on a weekend visit when Trista came to the DHS's attention. Justin has taken complete responsibility for T.E.'s care since August 2009 and ensured that T.E.'s developmental delays have been addressed. He has submitted to the court's jurisdiction and cooperated with services. We agree with the juvenile court that Trista did not have sole custody pursuant to section 600B.40.

Consequently, both parents were entitled to legal custody of T.E. before the initiation of the CINA proceedings. *See In re J.R.H.*, 358 N.W.2d 311, 319 (Iowa 1984) (noting the fact that the mother did not have physical custody of the children prior to these proceedings did not affect her status as a parent or her legal right to custody absent a court order otherwise).

We are also in agreement with the juvenile court that after the dispositional hearing, placement of T.E. with Justin was pursuant to Iowa Code section 232.101 (order "permitting a child's parent ... at the time of the filing of the petition to retain custody"). While Trista contends the court erred in finding the parents had a tacit agreement that Justin became pri-

---

9. Trista argues that because she had sole custody at the time the CINA petition was filed, custody could only be transferred to the father upon clear and convincing evidence that (1) a termination of the parent-child relationship would not be in the best interest of the child, (2) services were offered to Trista to correct the situation that led to the child's removal, and (3) the child cannot be returned to Trista. *See* Iowa Code § 232.104(3); *In Interest of N.M.*, 528 N.W.2d 94, 99 (Iowa 1995).

mary physical custodian prior to initiation of the CINA case, we do not address the issue because we find it of no legal significance. Justin shared the right to legal custody at the time the CINA petition was filed and thus after the dispositional hearing, placement of T.E. with Justin was as a parent retaining custody, not as a transfer of legal custody under section 232.102.

We further conclude that the permanency order entered pursuant to 232.104(2)(a) (returning child to child's home after permanency hearing) was not in error. We affirm.

**AFFIRMED.**