# IN THE COURT OF APPEALS OF IOWA

No. 17-2001
Filed June 5, 2019

**ADRIAN DARIUS WILSON,**
        Plaintiff-Appellee,

**vs.**

**CHELSEA RAE JACQUES,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

Chelsea Jacques appeals the district court's decree ordering custody of her child with Adrian Wilson and ruling on her petition to disestablish Wilson's paternity of the child. **AFFIRMED.**

Lisa M. Noble of Lisa Noble Law Office, Des Moines, for appellant.

Joseph G. Bertogli, Des Moines, for appellee.

Considered by Potterfield, P.J., Bower, J., and Mahan, S.J.*  Gamble, S.J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**MAHAN, Senior Judge.**

Chelsea Jacques appeals the district court's decree ordering custody of her child with Adrian Wilson and ruling on her petition to disestablish Wilson's paternity of the child. Upon our review, we affirm.

## I. Background Facts and Proceedings

Chelsea and Adrian had an "on-and-off" relationship for several years prior to 2016. Chelsea gave birth to V.A.W. on April 19, 2016. At the hospital on the day of V.A.W.'s birth, Adrian informed Chelsea that "there was going to be another one." At that point, Chelsea learned Adrian had a girlfriend, Mindy, who was also pregnant. Chelsea was devastated as she believed she and Adrian were going to get married and "have a family together."

Adrian questioned whether V.A.W. was his child because he believed the child looked a different race. Nevertheless, Chelsea gave V.A.W. Adrian's last name. Chelsea and Adrian completed an affidavit of paternity at the hospital, but it was returned as incomplete by the Iowa Department of Public Health Bureau of Vital Statistics because it lacked proper identification and a notary seal.

Both Chelsea and Adrian have a history of drug use. V.A.W. was born testing positive for the presence of marijuana.[1] Chelsea smoked marijuana with Adrian prior to the child's birth.[2] A department of human services (DHS) investigation resulted in a founded child-abuse assessment against Chelsea; the report was completed in May 2016, and the case was closed.

---

[1] The child also tested positive for the presence of opiates, which could be explained by Chelsea's prescription for hydrocodone for a dog bite.
[2] Adrian also left the hospital to smoke methamphetamine in a vehicle while he was waiting for V.A.W. to be born.

Chelsea and Adrian took V.A.W. home from the hospital to Brent Bruton's residence in Ames, where Chelsea lived.[3] After a few days, Chelsea informed her DHS caseworker that she was moving to Colorado because Adrian denied V.A.W. was his child and he had gotten another woman pregnant. Chelsea returned to Iowa after about one week. Chelsea did not allow Adrian to see V.A.W. for several months. But she let Adrian visit V.A.W. on Father's Day, and after that, she let him see the child "whenever he wanted to."

Sometime around July 22, 2016,[4] Chelsea brought V.A.W. to Adrian's apartment in Saylorville for a visit. She brought an affidavit of paternity with her. According to Chelsea, she left the affidavit blank and told Adrian he needed to complete a DNA test before she would be ready to sign it. In contrast, Adrian stated he and Chelsea both signed the affidavit that day. Mindy, who is a notary, testified Chelsea signed it in the hallway of the apartment that day but did not date her signature. Mindy stated Adrian signed the affidavit of paternity on July 27, and on that same day, she took the affidavit "to work to put [her] notary stamp on it."[5] Mindy stated she wrote the date "July 27" next to Chelsea's signature "because that was the date [she] notarized it." That affidavit of paternity was accepted by the Iowa Department of Public Health Bureau of Vital Statistics, and a new birth certificate was issued for V.A.W. listing Adrian as the father.

---

[3] Brent is a widowed, retired Iowa State professor, who viewed himself as "kind of a father figure" to Chelsea. He testified he met Chelsea in a Sprint store in 2009.
[4] The parties testified the visit took place on Saturday, July 22, but July 22, 2016, was a Thursday.
[5] Mindy works as a legal secretary for Adrian's attorney.

Meanwhile, when Adrian and Mindy went to Brent's house to return V.A.W. to Chelsea after the July 22 visit, Chelsea was not there. According to Chelsea, she told Adrian to leave V.A.W. with Brent and Cindy Wisecup.[6] Chelsea stated she told Adrian not to bring Mindy with him and she was waiting at Kum & Go nearby until they left so she could go home without having to see Mindy. But according to Adrian and Mindy, Brent and Wisecup informed them that Chelsea was no longer living there.[7] Adrian stated they did not want to leave V.A.W. at Brent's house if Chelsea was not there, so they took the child back to his apartment. In contrast, Brent testified Chelsea had lived at his house for the better part of six to eight years and she was still living there on the day Adrian returned with V.A.W.

In any event, when Chelsea returned home, V.A.W. was not there. She called Adrian numerous times, but he did not answer. The next day, Chelsea went to Adrian's apartment with the police, but he showed the paternity affidavit to the police and they "told Chelsea that she had to take it to court, it was a civil matter." Since then, V.A.W. has lived with Adrian, Mindy, and their child, who was born a few months after V.A.W.

On July 28, Adrian filed a petition to establish custody, visitation, and child support, requesting custody of V.A.W., with visitation to Chelsea, and that Chelsea be ordered to pay child support. Chelsea filed an answer, admitting Adrian was V.A.W.'s father, but stating Adrian had "seized the minor child from [her] care and

---

[6] Wisecup, her son, and her fiancé also lived at Brent's house at that time; they have since moved out.

[7] Adrian also testified that Chelsea was "afraid to come back because of the DHS case." We note the DHS case was closed in May 2016.

custody through a combination of force and fraud." She requested the court place V.A.W. in her custody "subject only to supervised visitation with [Adrian] as will not endanger the minor child."

Trial took place over three days in August 2017. The district court heard testimony from Chelsea, Adrian, Mindy, and several other witnesses. At the close of trial, the court noted its concern that the paternity affidavit was "fraudulent," ordered Adrian to complete a DNA test, and left the record open for the results of the test. The court also issued a temporary visitation order allowing Chelsea to have visitation with V.A.W. every Saturday under Brent's supervision.

The DNA test revealed Adrian is not V.A.W.'s biological father. Chelsea then filed a petition to disestablish paternity, which Adrian resisted. A hearing took place on Chelsea's petition. At the outset, the court stated "notwithstanding [its] suspicions," it would not set aside the affidavit of paternity, concluding that action "would be beyond the scope of these proceedings" and finding Chelsea "has her remedies" if she "wishes to pursue that." Meanwhile, Adrian filed a petition to terminate all putative father's rights to V.A.W., which the court subsequently granted following a hearing.[8]

The court appointed a guardian ad litem. At a hearing in October, the guardian ad litem opined it was in V.A.W.'s best interest to disestablish Adrian as the child's father, stating although Adrian was "certainly bonded" with V.A.W., he had prevented V.A.W. from having contact with Chelsea "to develop a

---

[8] It does not appear Chelsea takes issue with that ruling of the district court on appeal. We note Chelsea's table of contents includes an argument challenging the court's ruling "disestablishing paternity of all putative fathers," but none of her briefed claims relate to that heading.

relationship." The guardian ad litem later retracted from her initial position; in a December report to the court, the guardian ad litem opined it was in V.A.W.'s best interest to be in Adrian's physical care subject to visitation with Chelsea, given the child's close bond with Adrian, the fact that Adrian "has been able to meet all of [V.A.W.'s] basic needs," and the fact that Chelsea continued to struggle with mental-health issues.

On December 7, 2017, the court entered a decree of custody, visitation, and support, placing V.A.W. in Adrian's care subject to Chelsea's visitation, granting the parties joint legal custody, and ordering Chelsea to pay $62 per month in child support. The court observed both parties "lied repeatedly" throughout the case, with Chelsea's credibility being "only slightly better" than Adrian's. The court noted concerns with "the toxic relationship of the parties; the incident of domestic violence;[9] the tendency of each party to exclude the other from contact with the child; and Chelsea's pledge that she will not co-parent with Adrian."

The court observed Chelsea was agitated, emotional, and erratic during trial and she admitted to being "off her meds" for bipolar disorder and post-traumatic stress disorder, but noted she sought mental-health care during post-trial proceedings. Chelsea has a criminal history for driving offenses and possession of marijuana, and she served a forty-five-day jail sentence after V.A.W.'s birth. Chelsea had not maintained consistent employment, and she did not have a valid driver's license. Her parental rights to her oldest child were terminated, and she lost custody of her second child. The court found that due to Chelsea's "chaotic

---

[9] Adrian acknowledged an incident of domestic abuse against Chelsea in 2015.

lifestyle," "she is unstable and is not in a position to provide a safe custodial environment for [V.A.W.] at this time."

The court noted Adrian's history of drug abuse and drug dealing, as well as Mindy's history of drug use, but stated there was no evidence either continued to use drugs. The court observed V.A.W. was "bonding with Adrian's family in the safety of his home" and "thriving in Adrian's care." The court further noted Adrian "did not take flight" when he learned he was not V.A.W.'s biological father and found, "For purposes of this decree, Adrian is the established father of V.A.W." The court stated:

> The court is sympathetic to Chelsea's plight. She experienced anguish from not seeing her baby for over a year. The baby may have experienced some trauma as well. But the bottom line is that Chelsea is not equipped to bring V.A.W. to healthy physical, mental, and social maturity. Chelsea is mentally unstable. Chelsea had drugs in her system at the time of the child's birth and fled the state during a child abuse investigation. While the child has been living with Adrian, she has been safe and well cared for. After he found out he was not V.A.W.'s biological father, Adrian continued to maintain a home for her and to advocate for her custody. He loves V.A.W. and believes her best interests are served in his care. Prior to trial, Chelsea was living a chaotic life characterized by mental health problems, substance abuse issues, and the lack of a stable residence. Since the trial, Chelsea has struggled to exercise her visitation. Chelsea undoubtedly loves V.A.W. However, Chelsea has demonstrated that she is not capable of supporting herself, much less a child. Chelsea does not have the capacity to provide for the emotional, social, moral, material, and educational needs of the child.
>
> After some initial concern that Adrian might flee with the child when his DNA results did not come back as expected, the guardian ad litem completed her investigation and filed her report. The [guardian ad litem] observes, "[Adrian] has assumed the role of V.A.W.'s father and he has been able to meet all of her basic needs. He is the only father V.A.W. has known and she has developed a father/daughter bond with V.A.W. Moreover, [Chelsea] does not appear to be in a position to assume primary care of V.A.W. and no other biological father has been identified." The guardian ad litem recommends "[Adrian] be awarded primary physical care of V.A.W.

subject to [Chelsea's] rights of visitation." As much as Chelsea is loathe to accept this fact, V.A.W. is thriving in Adrian's care. While Adrian has a history of drug abuse, he is not using now. He is stable. Adrian is employed. He is capable of supporting himself and the child. He has a stable home with Mindy and their child. Adrian and V.A.W. have a father/daughter bond. V.A.W. has bonded with her little sister and is happy in Adrian's care. While V.A.W. may have experienced some confusion as a baby when she was no longer seeing her mother, that trauma would be compounded by removal from Adrian's care now. Although it turns out that Adrian is not V.A.W.'s biological father, Adrian is the only father V.A.W. has ever known and he is the only father she will ever have.

Ultimately, the court concluded, "[C]onsidering the long-term best interests of the child, the court is convinced that Adrian should have primary physical care" and "Chelsea should have joint legal custodial rights and robust visitation to maintain the opportunity for maximum continuous physical and emotional contact possible with V.A.W."

Meanwhile, on the same day, the court entered a ruling denying Chelsea's petition to disestablish Adrian's paternity. The court first noted Adrian requested his paternity be preserved and the parental rights of all putative fathers had been terminated by the court's prior order. *See* Iowa Code § 600B.41A(6)(a)(1), (3) (2016). The court then applied the factors set forth in section 600B.41A(6)(a)(2) (including V.A.W.'s age, the length of time since the establishment of paternity, the relationship between V.A.W. and Adrian, and the possible benefit by establishing V.A.W.'s actual father) and determined it was in V.A.W.'s best interest to preserve Adrian's paternity. The court found:

> [T]he court finds that it is in the best interest of the child to preserve the paternity of Adrian Wilson. The Court agrees with the assessment of the guardian ad litem. Adrian Wilson has stepped up to be [V.A.W.'s] father. He is the only father she knows and the only father she will ever have. [V.A.W.] has a father-daughter bond with

Adrian Wilson. It would be detrimental to the best interest of the child to sever that bond now.

Chelsea appeals.[10]

## II. Standard of Review

We review actions to establish or overcome paternity under chapter 600B for errors at law. *Callender v. Skiles*, 591 N.W.2d 182, 184 (Iowa 1999). "Likewise, our review of statutory interpretation is at law." *Id.* Although issues relating to custody and physical care are generally reviewed de novo; Chelsea's claims on appeal stem from the district court's legal conclusions regarding Adrian's establishment as V.A.W.'s father. Accordingly, our review is for error.

## III. Discussion

Chelsea contends the district court erred in ordering custody of V.A.W. with Adrian when he was not the child's biological father, legal father, or her husband. Chelsea claims the court "improperly interpreted" Iowa Code section 600B.40 in determining Adrian "had any custodial rights to the minor child born out of wedlock." Because these claims are related, we address them together.

Iowa Code section 600B.40(1) provides:

> The mother of a child born out of wedlock whose paternity has not been acknowledged and who has not been adopted has sole custody of the child unless the court orders otherwise. If a judgment of paternity is entered, the father may petition for rights of visitation

---

[10] Chelsea appeals the court's December 7, 2017 decree and order. Adrian contends Chelsea did not preserve error on her claims regarding the court's ruling on her petition to disestablish paternity because she only appealed the custody decree entered by the court. We have reviewed the motions, resistances, and orders on the appellate docket regarding this issue. We conclude Chelsea's arguments are preserved. Both district court orders were final orders filed under the same case number, and the combined certificate references both the trial (custody decree) and hearings (disestablishment petition and termination of putative fathers' parental rights petition). Accordingly, we consider all claims raised by Chelsea on appeal.

or custody in the same paternity action or in an equity proceeding separate from any action to establish paternity.

According to Chelsea, under section 600B.40(1), because Adrian "repudiated his paternity to V.A.W. while [Chelsea] was pregnant, during V.A.W.'s birth, and after V.A.W.'s birth" and because "V.A.W. was not adopted," Chelsea had "sole custody of V.A.W." and when Adrian did not return V.A.W. to Chelsea, he "had stolen the child."[11]

Chelsea's claim is appealing at first blush. But Iowa courts have interpreted the term "acknowledged" in section 600B.40 quite literally, and as not requiring paternity which has been established by some means authorized by law. The supreme court has stated, "The first sentence of [section 600B.40(1)] places sole custody of a child with the mother unless the paternity has been 'acknowledged.'" *In re B.L.*, 470 N.W.2d 343, 346 (Iowa 1991). The statute requires that the father "steps forward and acknowledges paternity of the child within a reasonable time." *Id.* ("This statute does not specify when the mother's right of sole custody commences. However, the best interests of a child dictate that the permissible time period during which the father may acknowledge paternity be short to eliminate prolonged uncertainty about the identity of the child's custodian.").

In *B.L.*, the court noted, "Common sense leads us to the conclusion that the legislature never intended to allow the putative father to silently stand back for an extended period of time, acknowledge paternity of a child at a convenient time, and then claim joint custodial rights." *Id.* Consequently, the court concluded the

---

[11] Chelsea also claims the court "disregarded" testimony that Adrian "stole the child" from her "under Iowa Code [section] 710.5." Because this case does not involve criminal charges against Adrian, we decline to consider this claim.

father had not acknowledged paternity within a reasonable time because the mother "had very limited involvement with the father who was not even aware of B.L.'s birth until B.L. was about one-year old," and "[t]hereafter, the father had very little contact with the boy." *Id.* at 344. "The father did not pay support until B.L. was over six years of age [when] he was forced to do so following a paternity action," and the father "never requested nor received any custodial or visitation rights." *Id.* The court observed, "The father's alleged acknowledgment of paternity came only after a suit for support was brought against him and blood tests were taken. By this time, the mother had already acquired rights of sole custody." *Id.* at 346.

In contrast, in *In re T.D.E.*, 796 N.W.2d 447, 453 (Iowa Ct. App. 2011), this court concluded the father had acknowledged paternity under section 600B.40 within a reasonable time. There, the father learned about the child two months after the child's birth. *T.D.E.*, 796 N.W.2d at 448. The father regularly visited the child, moved to the mother's home town to be part of the child's life, and began paying child support. *Id.* He signed a paternity affidavit, and his name was placed on the child's birth certificate. *Id.*

Here, the district court found, "There may be a question whether Adrian was the acknowledged father at the moment he retained physical custody of the child when Chelsea was not present for the exchange following visitation on July 22, 2016." But, "As of July 27, 2016, [when the affidavit of paternity was notarized,[12]]

---

[12] Chelsea claims on appeal that the court "disregarded" testimony by Adrian and Mindy "that they had collaborated together to file a fraudulent affidavit of paternity," which resulted in the Adrian receiving custody of V.A.W. Our findings below with regard to the timing of Adrian's acknowledgment of paternity dispel Chelsea's claim.

Adrian was the acknowledged father of V.A.W." The district court further determined:

> Chelsea accuses Adrian of the crime of child stealing in violation of Iowa Code section 710.5. Adrian has never been arrested and charged with child stealing. As of July 27, 2017, Adrian was the acknowledged father of the child. Chelsea did not prove that her signature on the affidavit of paternity was forged. Adrian acknowledged paternity and is the established father of V.A.W. Chelsea contends she has sole custody of the child under Iowa Code section 600B.40, concerning the custody of children born out of wedlock. Adrian's paternity has been acknowledged. Iowa Code section 600B.40 does not apply.

Although we agree with the court's conclusion, we do not believe the question with regard to Adrian's acknowledgment of paternity is that close. Chelsea testified she and Adrian "lived together for a long time" before V.A.W. was born and they were "going to get married" and "have a family together." Adrian accompanied Chelsea to the hospital for V.A.W.'s birth. He initially questioned whether the baby was his, but he signed an affidavit of paternity at the hospital, and Chelsea gave V.A.W. Adrian's last name.[13] As the district court noted, "Chelsea did not dispute Adrian's paternity at that time."

According to Chelsea, Adrian questioned V.A.W. was his child for the first several months, but Chelsea acknowledged he requested visitation with the child. Adrian testified he called and texted Chelsea asking about V.A.W. and he bought clothes for child and delivered them to Brent's house.[14] In text messages to Adrian during that time period, Chelsea referred to V.A.W. as "your baby" and "your

---

[13] Adrian was asked, "So you acknowledged paternity at the time the child was born?" to which he responded, "Yes."

[14] According to Adrian, "I'd ask to see her, and she would send me a picture and say, there, you've seen her."

daughter." In response, Adrian referred to V.A.W. as "my daughter" and to himself as the child's "real dad." Chelsea testified she allowed Adrian to see V.A.W. on Father's Day because "[h]e had told me it was wrong of me to keep a child that he was there for when she was born away from him." Thereafter, Chelsea stated she "let him see her whenever he wanted to." Under these facts and circumstances, we conclude Chelsea did not have sole custody of V.A.W. under section 600B.40 because Adrian acknowledged his paternity on or around the time of the child's birth. *Cf. T.D.E.*, 796 N.W.2d at 453.

The district court also found, "For purposes of this decree, Adrian is the established father of V.A.W." "Although the term 'established father' is not expressly defined by our legislature, companion statutes make it clear it refers to paternity which has been established by some means authorized by law." *Callender*, 591 N.W.2d at 184. For example, "[i]t applies where paternity has been legally established under section 252A.3 [(concerning liability for support)]." *Id.* at 185 (citing Iowa Code § 600B.41A). As relevant here, Iowa Code section 252A.3(10)(b) provides that paternity may be established "[b]y the statement of the person admitting paternity in court and upon concurrence of the mother."

At trial, Adrian testified he was V.A.W.'s biological father. Chelsea's attorney confirmed Chelsea "has never contested that Mr. Wilson is the biological father of this child." Later, Chelsea's attorney reiterated, "Your Honor, [Chelsea] has never denied that Adrian Wilson is the biological father of [V.A.W.]" We conclude Adrian's paternity was legally established by his statement, and

Chelsea's concurrence, before the court.[15]  *See* Iowa Code § 232A.3(10)(b); *cf.*

*Callender*, 591 N.W.2d at 184–85.

As difficult as the facts of this case are to digest, the district court observed, and we must agree: "Chelsea bears some responsibility for this predicament."  As the court noted:

> Up until the last day of trial, Chelsea never questioned Adrian's paternity even though she knew she had sex with other men around the time of conception.  Chelsea named her child after Adrian.  She twice signed paternity paperwork to establish his paternity.  Chelsea was gone when Adrian attempted to return the child from visitation.  After Adrian retained possession of the child, Chelsea continued to live her chaotic lifestyle.  She continued to use drugs.  She went to jail.  Chelsea admitted Adrian's paternity in her answer.  She never sought a temporary custody or visitation order.  All the while, the child was bonding with Adrian's family in the safety of his home.

The focus of Chelsea's arguments on appeal is with regard to the circumstances surrounding the second affidavit of paternity and Adrian's legal basis for custody of V.A.W.  But Chelsea does not argue she is better able to administer effectively to the long-range best interests and needs of V.A.W.  In this situation, "we do not believe the critical issue to be which parent possesses the greater right to the child."  *Heyer v. Peterson*, 307 N.W.2d 1, 7 (Iowa 1981).  Instead, "the controlling consideration must be the interests of the child."  *Id.*

> This profound decision involves selecting as the custodial parent the person who can minister more effectively to the long-range best interests of the child.  The objective ought always to be to place the child in the environment most likely to bring that child to healthy physical, mental and social maturity.

*Id.*

---

[15] Adrian also alleged he was V.A.W.'s father in his petition to establish custody, and in her answer, Chelsea admitted Adrian was V.A.W.'s father.

Here, the district court abided by this principle, stating:

> The court must accept the facts as the court finds them. The court cannot undo what the parties have done. V.A.W. is where she is. It is not the proper role of the court to reward or punish the parents with an award or denial of child custody. The bottom line going forward is the best interest of the child.

We agree this case is unusual and troubling, and both Chelsea and Adrian must bear some blame for any lasting effect their misguided actions thus far will have on V.A.W. At the end of the day, V.A.W. is fortunate to have two parents who love her and care about her. We trust that going forward Chelsea and Adrian will make efforts to put their animosity for each other aside and work together to be the best parents they can be for V.A.W.

We have carefully reviewed the voluminous record in this case, including numerous exhibits as well as testimony from trial and multiple hearings. We believe the district court properly applied the relevant legal principles and reached a decision that will work in V.A.W.'s long-term best interest. We affirm the decree and order entered by the court.

**AFFIRMED.**