## IN THE COURT OF APPEALS OF IOWA

No. 23-1564
Filed December 20, 2023

**IN THE INTEREST OF L.S. and C.S.,**
**Minor Children**

**A.M., Mother,**
        **Appellant.**
_____

Appeal from the Iowa District Court for Scott County, Christine Dalton, District Associate Judge.

A mother appeals the permanency order continuing placement of her two children in the sole custody of their father. **AFFIRMED.**

Camille Kahn of Brubaker, Flynn & Darland, P.C., Davenport, for appellant mother.

Steven W. Stickle of Stickle Law Firm, P.L.C., Davenport, for appellee father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Jennifer M. Olsen of Olsen Law Firm, Davenport, attorney and guardian ad litem for minor children.

Considered by Greer, P.J., and Ahlers and Buller, JJ.

**GREER, Presiding Judge.**

The mother, A.M., appeals from a September 2023 order after a contested permanency review hearing that placed her two children in the sole custody of the father, only allowing her supervised visitation until further action by the district court under a grant of concurrent jurisdiction. She argues that the State failed to prove by clear and convincing evidence: (1) that the children could not be returned to her custody and (2) that placement of the children in the sole custody of their father was in their best interests. On our de novo review, we affirm.

**I. Background Facts and Prior Proceedings.**

This appeal concerns two minor children: L.S., born in July 2020, and C.S., born in October 2021. Their parents have never married; they separated during these proceedings. There was no previous order establishing custody between the parents. We previously reviewed some of the relevant background facts in the mother's appeal of the juvenile court's October 2022 dispositional ruling on reasonable efforts by the Iowa Department of Health and Human Services to reunify her and the children. *See generally In re L.S.*, No. 22-1839, 2023 WL 1811046 (Iowa Ct. App. Feb. 8, 2023) (affirming the juvenile court's finding that the department made reasonable efforts by the time of the hearing to return the children to the mother's custody though recognizing it was initially slow to act).

That decision described the facts leading to involvement with the department:

> This case opened in April 2022 when the mother had a physical fight with the children's paternal grandmother and drove away, while intoxicated, with six-month-old C.S. in the car. Child protective services returned a founded assessment of improper

supervision by the mother. The parents agreed to a safety plan with the department. But one month later, the mother fought with the father and attempted suicide. After being released from the hospital, she admitted to stopping her mental-health medication and drinking alcohol. The parents signed a new safety plan in June, agreeing that the mother would not watch the children without supervision and would be a sober caretaker. In violation of that plan, the mother took the children to an out-of-town wedding and cared for them at the motel—by herself, while intoxicated. Child protective services again returned a founded assessment of improper supervision by the mother.

In July, the juvenile court adjudicated C.S. and L.S. as children in need of assistance (CINA) and placed them in their father's custody. By the time of the adjudication hearing, the mother had entered treatment.

*Id.* at *1. The mother's actions led to convictions of operating while intoxicated, second offense, and child endangerment for driving while under the influence with C.S. in the vehicle and resulted in a founded child abuse assessment for failure to provide proper supervision. After the July CINA hearing, the juvenile court determined that "the parents need to abstain from the use of drugs and/or alcohol, and [the mother] needs to address her mental illness more effectively . . . [as she] continued to get intoxicated and her suicide attempt was in the home of the children." The juvenile court also found that the mother should not be left alone with the children. By August, the mother had secured housing, and in September she obtained a temporary restricted license and had an Intoxalock Ignition Interlock device, which measures the would-be driver's sobriety, installed on her vehicle so that she could drive.

In October, the juvenile court held a disposition hearing and issued its dispositional order. At that time, there were concerns about compliance by both

parents due to the father allowing unsupervised visits between the mother and children and even allowing the mother to take a child with her to a store. And, when the father was asked about his relationship with the mother, he described it as "romantic." Addressing the mother's social history in the order, the juvenile court noted that the mother "has a good history of treating her mental illness successfully . . . [but] this summer something changed." The juvenile court then found the mother's mental health was "jeopardizing the safety and well-being of her children." It was noted that the mother was "drinking and appearing intoxicated at times." After confirming placement in the custody of the father under the supervision of the department, the juvenile court required that the mother "have supervised visits to ensure her parenting skills are good and there are no risks of emotional or physical harm to the kids." The juvenile court ordered the mother to complete all recommended substance-abuse and mental-health treatment to move toward unsupervised visitation with the children. Lastly, the juvenile court ordered the parents to participate in a solution focused meeting with the department. It was after this hearing that the mother appealed, contending reasonable efforts were not being made by the department. *See id.* at *3.[1]

By November 2022, the mother completed substance-abuse treatment. She also began meeting with a mental-health therapist and taking medication for her mental health. But it was also during this time that the mother called the police to report child endangerment on the family services specialist (FSS) after accusing her of not securing the children in the car seats. The FSS noted the mother had

---

[1] The mother did not request for further review, and procedendo issued February 28, 2023.

buckled the children in their seats. The FSS noted the mother reported panic attacks after visits, reported she and the father "were not talking," and stated the father was going to cancel her weekend visit. On top of that the mother disregarded visitation restrictions put in place when she asked to take the children out of state. The semi-supervised visits were moved to fully supervised given safety concerns based on the mental health of the mother and her cooperation with the safety plan.

The juvenile court held a review hearing in January 2023. The court continued placement of the children in custody of their father. Still the juvenile court noted the mother "displays very good parenting skills." But of concern was the mother's honesty involving her mental-health treatment—both to the court and to the current therapist— so that counseling could be beneficial. The mother was directed to obtain a psychological evaluation.

Between January and June 2023, tensions between the parents increased. While L.S. and C.S. were in the custody of the father, the mother made several calls for child abuse to the department, alleging various issues with care by the father and his girlfriend; the department determined that all were unfounded. The mother also made several calls to law enforcement for welfare checks related to the father and his girlfriend. In one of the reports, the mother alleged sexual abuse of L.S. by the paternal grandfather in January 2023. After L.S. underwent a physical examination, the department determined that the report was unfounded. In another report, the mother alleged that the father had physically abused L.S. in February 2023 and left a hand-shaped bruise on the back of L.S.'s left leg; the department determined that that report was also unfounded. During this same

time, on thirty-two different dates, the mother ingested enough alcohol that the interlock device on her vehicle recorded a positive result. The mother also sent many messages over a co-parenting app and Facebook messenger; and she made Facebook posts disparaging the father and his girlfriend and complaining about the placement of the children with the father. Then, around February, the mother learned she was pregnant with a third child, and both parents acknowledged that the baby could be the father's as they had been intimate in January. But in February, the mother took a urine analysis (UA) test that was negative for all substances, and her therapist opined she was doing well and stated she had no concerns over "[the mother's] parenting her children."

Then in March, the department looked at changing the family interaction plan to allow the mother more visitation and permission to transport the children for visits. The guardian ad litem (GAL) objected after meeting with the father and his attorney. Videos were presented, some old and some more recent, that showed the mother's attempts at self-harm and drinking alcohol. Text messages from the mother included inappropriate messages from her to the father. The plan was to have the mother complete a new substance-abuse evaluation, have no contact with the father, and find a new mental-health specialist. The GAL would procure a court order to fund the psychological evaluation.[2] Yet the FSS noted "concern with the father waiting until a transition plan was put in place before

---

[2] In the permanency hearing in June 2023, the social work supervisor testified the evaluation was scheduled with a new psychology group for the middle of September. The record does not show if it was completed or submitted to the court or what the evaluation revealed. This is surprising as the evaluation had been discussed and was on the department's radar since late 2022.

bringing forth concerns . . . which span back several months. [The father] has not hesitated to voice concerns regarding other matters to this worker yet did not share the videos or text messages until now." The department recommended the mother secure a new therapist and complete the psychological evaluation and opined that "both parents will need to come to agreement regarding putting their own differences and toxic past relationship aside to better their co-parenting relationship and communication for their children." In April the GAL filed a report indicating that she and the department "were at odds related to the course of this case" and, after researching the mother's mental-health diagnoses, detailed behaviors she felt supported a significant mental-health concern involving the mother.

A permanency hearing was held over four days in April, June, July, and August 2023. The testimony focused on the parents' inability to communicate effectively with each other and the mother's potential mental-health diagnoses as well as an alleged additional suicidal threat in May 2023. Many exhibits were provided that appeared to support concerns over the mother's behavior, including text messages between the parents, videos of the mother, the mother's Facebook postings, and the results of the device in her car measuring sobriety. The social work case manager opined that although progress was still needed for the mother and she still needed to complete a comprehensive psychological evaluation, because the mother had completed substance-abuse treatment and reengaged with mental-health therapy, she would no longer require full supervision with the children. She also stated that both the mother and the father had very good

parenting skills and that many of the concerning exhibits referenced older behaviors of the mother, even though it was difficult to trust either parent.

And in June, the Family Support Specialist (FSS) testified more strongly that after observing the mother since September 2022, that the mother had very good parenting skills, there was no concern over the mother's sobriety, and the children were safe in her care. She also believed that the mother's mental-health was not negatively affecting her parenting or putting the children at risk. Finally the FSS noted it was not in the best interests of the children to continue the fully supervised visitation schedule and there was no reason to continue court and department involvement. As to the ability of the parents to co-parent, the FSS said, "That is something they're going to have to work very strongly on, but that doesn't mean that the children should be kept from either parent because of the inability or the difficulties in coparenting." In the end, the FSS thought the mother's behavior arose because of her relationship with the father and feeling out of control. The mother's therapist had a similar analysis of the mother's mental-health situation.

The mother testified that she was employed, had acceptable housing, and was working on a second Master's degree. To her credit, the mother admitted that she had been struggling with postpartum depression, but noted she was engaged in counseling. As an explanation for some of her behavior, the mother also testified that the increase in calls to the department and to law enforcement was due to her anxiety plus her romantic relationship with the father ending and the overall decrease in cordiality. Finally, she pointed to a canker sore medication and a friend borrowing her car for the positive results on the Intoxalock.

The social worker case manager who took over this case in December 2022 also testified somewhat differently than her supervisor:

> Q. So what overall is your recommendation here today? A. At this point in the case, the [d]epartment, we made a determination that, you know, we've done all the efforts we can to reunify the children with [the mother]. However, we don't feel like they have been successful. We're recommending that the Court allow for concurrent jurisdiction.
> Q. You're recommending that the children be placed in the custody of their father? A. Yes.
> Q. And are you in support of the father, you know, seeking sole physical and legal custody of the children? A. Yes.
> Q. What, if any, other recommendations do you have at this time? A. That obviously the parents continue to try to demonstrate positive, safe lifestyle changes and safe decisions that can be apparent to [the department] and the juvenile court, and that, of course, the department make—the Court make a determination that we have made all possible reasonable efforts.

After weighing days of testimony and numerous exhibits, the juvenile court issued its permanency ruling in September 2023.[3] Three main issues appeared to be at the forefront of the juvenile court's consideration of permanency: the mother's alcohol abuse, her mental-health concerns, and the co-parenting tensions between the mother and father. In the ruling, the juvenile court found that "[t]he children have not, at this point, been dragged into the drama their mother tries to create." At the same time, "[w]ith the number of false claims and spoken untruths during her testimony and her dealings with the GAL and case professionals, it is difficult to determine what is credible when she testifies." Furthermore, the juvenile

---

[3] While the mother has hinted at events that occurred after this September 2023 permanency ruling, these events are outside our record facts, and we do not consider them. *See* Iowa R. App. P. 6.801 (describing the contents of the record on appeal); *Rasmussen v. Yentes*, 522 N.W.2d 844, 846 (Iowa Ct. App. 1994) (noting we do not consider facts that are not part of the record); *In re Marriage of Keith*, 513 N.W.2d 769, 771 (Iowa Ct. App. 1994) ("We are limited to the record before us and any matters outside the record on appeal are disregarded.").

court anticipated that "[i]t may be necessary to prosecute her false calls to law enforcement and [the department] to prevent future harm to the children if the behaviors continue." After finding that termination of the mother's parental rights was not in the children's best interests, the juvenile court concluded "that placement of the children in the sole custody of their father is in their best interests." It also ordered supervised visitation with the mother. The mother appeals.

**II. Standard of Review.**

Our review of permanency orders is de novo. *In re D.M.*, 965 N.W.2d 475, 479 (Iowa 2021). Although we give weight to the juvenile court's factual findings, we are not bound by them. *In re T.D.E.*, 796 N.W.2d 447, 453 (Iowa Ct. App.2011). Our paramount consideration is the best interests of the children. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003).

**III. Analysis.**

On appeal, the mother argues that the juvenile court should have returned the children to her custody as the State failed to demonstrate by clear and convincing evidence both that the children could not be returned to her home and that placement of the children in the sole custody of their father was in their best interests. "Although the juvenile court has the authority to transfer custody to the noncustodial parent, '[a]ny such placement is subject to the constraints in [Iowa Code] section 232.102, including the goal of returning the child[ren] to the original custodian as quickly as possible.'" *D.M.*, 965 N.W.2d at 480 (first alteration in original) (citation omitted). If "the evidence shows the [children's] return [to the custodial parent] will not produce harm, the child[ren are] to be reunited with the [custodial] parent." *Id.* (fourth alteration in original); *accord In re Blackledge*, 304

N.W.2d 209, 214 (Iowa 1981) ("When [children are] removed from the home, services are provided to the parent to facilitate the child[ren]'s return. When the evidence shows the return will not produce harm, the child[ren are] to be reunited with the parent."). "The primary goal of the juvenile court in CINA proceedings is reunification when parties have specifically complied with court-ordered services . . . ." *D.M.*, 965 N.W.2d at 483. Here, based on past performance, we recognize this effort got off to a slow start, but once on track the question becomes can these children be safely reunited with the mother. *See L.S.*, 2023 WL 1811046, at *3.

So, "[w]e look to the past for indicators of what is likely to occur in the future." *In re M.P.*, No. 19-0995, 2019 WL 5063337, at *5 (Iowa Ct. App. Oct. 9, 2019); *see also In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) ("When making this decision, we look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future."). Since the department's involvement, there is no evidence that the mother placed the children in harm's way and, in fact, the testimony at the permanency hearing emphasized, as did the juvenile court, that the mother has very good parenting skills. Instead, the evidence developed focused more on the mother's mental health and her inability to co-parent without drama. Against that backdrop, the mother's past behavior includes continuous and repeated reports to the department, to law enforcement, and to other service providers regarding the actions of the father and his girlfriend. None of those reports were founded. And "continuous unfounded abuse reports operates a significant emotional harm to these children." *Knotek v. Mellin*, No. 19-1600, 2020 WL 5229429, at *8 (Iowa Ct. App. Sept. 2, 2020); *In re B.O.,* Nos. 1999-

2649, 9-494, 98-1479, 1999 WL 1020536, at *3 (Iowa Ct. App. Nov. 10, 1999) (finding child was psychologically harmed by "[h]aving to repeatedly explain foundless allegations of abuse to law enforcement").  Here there was no testimony that harm had yet occurred to the children from the unfounded allegations but there was argument it could cause harm into the future.  To that end, an "inability to regulate. . . emotions and interact with others impedes [the] ability to provide adequate care for . . . children."  *In re K.S.*, No. 18-1759, 2018 WL 6705523, at *2 (Iowa Ct. App. Dec. 19, 2018); *accord In re O.N.*, No. 17-0918, 2017 WL 3525324, at *3 (Iowa Ct. App. Aug. 16, 2017) (determining that a mother's inability to regulate her emotions supported determination that her child could not be returned to her custody).

On this point, we find that the mother's arguments for return of the children to her custody fail.  We commend the mother for her steps towards regaining control of her alcohol use and her mental health.  We acknowledge that she has completed mental-health and substance-abuse treatment and, although she has submitted many breath samples in the Intoxalock device that were greater than a .000 blood alcohol content, since becoming pregnant again she has significantly decreased the frequency of doing so.  We also recognize that the up and down aspect of her relationship with the father could contribute to the mother's anxiety.  And that at least some of the people working directly with the parents believed the father was also contributing to the failure to co-parent.  Likewise, we find it concerning that, as with the slow start on visitation, the comprehensive psychological evaluation that might have helped with the mother's treatment was

initially discussed in late 2022 but was slow to be authorized, not scheduled until September 2023, and then never made a part of this record.

In the end, the mother's inability to regulate her emotions even with the extensive mental-health therapy accessed over the life of this case works against her claim that she can parent without harm to the children. The numerous calls complaining about the actions of the father and alleging unsubstantiated instances of child abuse have demonstrated that the children could not be returned to her custody without harm as such calls and investigations themselves constitute harm. Likewise, placement of the children in the custody of the father was in their best interests to protect them from any harm that might stem from the mother's unregulated anxiety over her unhealthy focus on the father. True, the mother has finalized substance-abuse treatment; been compliant with the therapist she selected; and moved forward with her Master's, employment, and home life. And—as some testified—had a very close bond with her children. With the case heading to the concurrent jurisdiction of the district court, she has an opportunity to show all of these efforts are worth it. Likewise, we hope the father can recognize his contribution to the co-parenting failure so that these children can have and know two healthy parents in their lives. We note that "[t]he word 'coparenting' implies that an effort will be made by more than just one parent." *D.M.*, 965 N.W.2d at 481. After over a year of services with little progress, we affirm the juvenile court's step of providing sole custody to the father with supervised visitation for the mother and the grant of concurrent jurisdiction for a final custody determination.

**IV. Conclusion.**

Because we find that the State has demonstrated that the children could not be returned to the custody of the mother without the risk of causing them harm from her continued alcohol abuse, inability to interact professionally and productively with the father, and inability to regulate her mental health, continuing their placement with the father is in their best interests, and we affirm.

**AFFIRMED.**